UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABRI CARE GROUP LLC,<br><br>Plaintiff,<br><br>— against —<br><br>ANTHONY ARNAUDY and BALBOA HOLDINGS LLC,<br><br>Defendants. | Civ. No. 26-cv-________ (___) (___)<br><br>**COMPLAINT** |

Plaintiff Abri Care Group LLC ("ACG" or "Plaintiff"), by and through its attorneys, Stern Law Group, as and for its Complaint against defendants Anthony Arnaudy ("Arnaudy") and Balboa Holdings LLC ("Balboa," and together with Arnaudy, "Defendants"), alleges as follows upon knowledge as to itself and its own acts, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. A company hands its chief financial officer the keys to everything that matters. He alone knows where the money sits, when it moves, and how to reach it. Anthony Arnaudy held those keys for Abri Health Services, LLC ("AHS"). When he turned against the company, he did not need to break in—he simply handed the keys to its enemies.

2. AHS managed a group of skilled-nursing facilities and their affiliated assisted-living facilities. Plaintiff ACG is the sole manager of AHS and a direct owner of the operating companies at the center of this dispute. Arnaudy served not only as AHS's Chief Financial Officer and as a member of AHS's board of managers, but also as the Chief Financial Officer of ACG itself. He owed duties directly to ACG.

3. Arnaudy holds his ownership interest in the AHS enterprise—including a membership interest in ACG—through Balboa, a California limited liability company he formed days before the 2021 acquisition and solely owns and controls, and which acts only through him. As an ACG member, Balboa is bound by the confidentiality covenant of the ACG Operating Agreement, an obligation that survives forever.

4. Arnaudy built and understood AHS's entire banking architecture: the structure of its accounts, its zero-balance-account sweep mechanisms, and the precise timing of its payroll disbursements and revenue collections. That information was among the enterprise's important trade secrets, and Arnaudy acquired it in his role as ACG's CFO and under an express and continuing duty of confidentiality.

5. In the first 20 months of ownership, Arnaudy shared little to no information with ownership, despite repeated written requests. And in a total of 20 months, they shared financials no more than ten times.

6. Arnaudy weaponized that trust. After ownership lost confidence in him and moved to strip him of unchecked control over the company's cash, Arnaudy set out to destroy the enterprise he had come to hate. He handed some of the enterprise's most sensitive financial information—when payroll went out, when revenue came in, and how the accounts holding its cash were arranged—to a hostile landlord, Ron Finch, and to a receiver, Guy M. Hohmann, for the express purpose of installing a receivership over ACG's operating companies and freezing the company's cash. While helping the landlord and receiver, Arnaudy misrepresented the ownership of AHS's 7640 account. Arnaudy told the receiver that the 7640 concentration account belonged to the entities the receiver could control. But Arnaudy knew it belonged to AHS. The receiver blindly followed Arnaudy's lie. The receiver later admitted under oath that Arnaudy's information was so essential that he could not—and would not—have taken the engagement without it.

7. Within hours of the receivership filing, the company was locked out of the accounts holding roughly $7.4 million—money the receiver seized based on nothing but Arnaudy's intentionally false say-so that the account belonged to the operating companies rather than to AHS. Arnaudy was paid for this treachery: he collected $20,000 per month from the very landlord he helped arm against the company.

8. Arnaudy was not finished. Shockingly, he was then secretly rehired—behind the board's and ownership's backs—not to perform any legitimate financial function, but to try to dig up damaging information about ownership's representative. During that unauthorized tenure he drew tens of thousands of dollars per month from AHS's own accounts, used its corporate resources, and, on his way out, accessed its payroll system to pay himself money he was not owed and had no authority to take. All this was done behind everyone's back.

9. As a direct result of Defendants' conduct, ACG lost the operating companies it owned and the value of a solvent enterprise. ACG brings this action to hold Defendants to account, to recover the funds wrongfully taken and the value destroyed, to compel forfeiture and disgorgement of the compensation Arnaudy earned while betraying his duties, and for all other relief to which ACG is entitled.

## THE PARTIES

10. Plaintiff Abri Care Group LLC is a Delaware limited liability company with its principal place of business in Brooklyn, New York. ACG is the manager of AHS, LLC and the direct owner of several skilled nursing facilities, including three facilities in Killeen, Texas (the "Killeen Entities").

11. Defendant Anthony Arnaudy is a natural person residing in Coronado, California. At various times relevant to this action, Arnaudy served as Chief Financial Officer of ACG, as Chief Financial Officer of AHS, and as a member of AHS's board of managers, and he is the sole

member and manager of Balboa. Arnaudy may be served at 920 Balboa Avenue, Coronado, California 92118, or wherever he may be found.

12. Defendant Balboa Holdings LLC is a California limited liability company (Entity No. 202105810187) organized by Arnaudy on February 23, 2021, with its designated office and mailing address at 920 Balboa Avenue, Coronado, California 92118. Balboa is, and at all relevant times was, a member of ACG and a party to the ACG Operating Agreement. Balboa may be served through its agent for service of process, Anthony J. Arnaudy, at 920 Balboa Avenue, Coronado, California 92118.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because ACG asserts claims arising under the laws of the United States: the Defend Trade Secrets Act, 18 U.S.C. § 1836 and Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g). The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over ACG's remaining claims, because they are so related to the federal claims that they form part of the same case or controversy.

14. This Court has personal jurisdiction over Balboa under Section 12.7 of the ACG Operating Agreement. Balboa is a member of ACG and a party to the ACG Operating Agreement. Section 12.7 provides that any legal action or proceeding with respect to the Agreement "shall be brought and determined in the federal or state courts of New York situate[d] in New York City," and each member "irrevocably submits . . . to the exclusive personal jurisdiction" of those courts and waives any objection based on an inconvenient forum.

15. This Court has personal jurisdiction over Arnaudy because he is bound by the same forum-selection and consent-to-jurisdiction provisions as a non-signatory closely related to the ACG Operating Agreement and the transactions it governs. Arnaudy is the sole member and

manager of Balboa, ACG's member, and served as the Chief Financial Officer of ACG and of AHS; his close relationship to the Agreement made it foreseeable that he would be bound by its forum-selection clause and consent to jurisdiction. *See Magi XXI, Inc. v. Stato della Città del Vaticano*, 714 F.3d 714, 722–23 (2d Cir. 2013); *Firefly Equities LLC v. Ultimate Combustion Co.*, 736 F. Supp. 2d 797 (S.D.N.Y. 2010).

16. In the alternative, this Court has personal jurisdiction over Arnaudy under FED. R. CIV. P. 4(k)(1)(A) and N.Y. C.P.L.R. § 302(a), because he transacted business within, and committed tortious acts causing injury within, the State of New York in connection with the conduct alleged herein, including by directing his misconduct at an enterprise whose ownership and control are centered in New York, with the purpose and effect of injuring ACG and its ultimate shareholders (including Abraham Frankl) in New York. The exercise of jurisdiction comports with due process.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to ACG's claims occurred in this District. ACG's ownership and control are centered in Brooklyn and Arnaudy acted with intent to injure ACG's shareholder and manager, Abraham Frankl. And Section 12.7 of the ACG Operating Agreement fixes venue in the federal or state courts situated in New York City, in which this District sits.

## FACTUAL BACKGROUND

### *A. The Abri enterprise, ACG's role, and Arnaudy's fiduciary duties.*

18. The Abri enterprise is a series of companies that operate skilled-nursing facilities and their affiliated assisted-living facilities in Texas. In this industry, many facilities operate on an "OpCo/PropCo" model: one company owns the real estate and buildings (the "PropCo"), and another company operates the facility and provides services to residents (the "OpCo"). AHS

provides management services for the various OpCos and PropCos of in the enterprise. ACG is the manager and direct owner of the OpCos and PropCos, including three skilled nursing facilities located in Killeen Texas (the "Killeen Facilities").

19. On March 1, 2021, the AHS enterprise was acquired by its current controlling ownership, whose ownership and control are centered in New York. Ownership designated a representative, Abraham Frankl ("Frankl"), to communicate with the company's officers, and trusted and relied on its fiduciaries—including Arnaudy—to serve as faithful stewards of the enterprise.

20. On April 12, 2021, ACG designated Arnaudy Chief Financial Officer of ACG. Arnaudy was also AHS's Chief Financial Officer and as the management-designated member of AHS's board of managers, a role he had held since May 2020.

21. As an officer of ACG and of AHS, and as a manager of AHS, Arnaudy owed ACG and the Abri enterprise fiduciary duties of loyalty, care, candor, and confidentiality. Because ACG and AHS are Delaware limited liability companies, the scope of those duties is governed by Delaware law.

22. Balboa, as an ACG member and party to the ACG Operating Agreement, was and is bound by Section 12.3 of that Agreement, which requires all non-public information regarding the company and its members and manager to be treated with strict confidentiality, and which provides that this obligation survives any termination of membership.

23. Balboa is Arnaudy's alter ego. Arnaudy is Balboa's sole member, sole manager, and agent for service of process, and Balboa acts only through him. Balboa was formed days before taking a membership interest in ACG for the sole purpose of shielding Arnaudy from liability. Arnaudy treats Balboa as himself by referring to himself as an "owner" of ACG and demanding

distributions to be paid directly to him, without reference to Balboa. Treating Balboa as a separate entity related to Arnaudy's acts against ACG would promote an injustice or permit fraud by allowing the sole member and manager of one of ACG's members use sensitive financial and other information against ACG and then hide behind a judgment-proof shell.

***B. Arnaudy conceals the enterprise's finances and pays himself.***

24. In the first twenty months after the 2021 change in ownership, Arnaudy and AHS's then-CEO Kevin O'Halloran ("O'Halloran") ran the enterprise as their own company with no active board oversight. They shared little to no financial information of ACG or the enterprise with ownership despite repeated written requests; in that entire period, they shared financials no more than ten times.

25. The relationship between Frankl and Arnaudy/O'Halloran began deteriorating at the end of 2022.

26. From the moment of ownership change in 2021, Frankl made clear that one strategic goal for the enterprise was to outsource financial back-office functions so the enterprise could focus on operations. This meant Arnaudy's job and influence over the enterprise would eventually be greatly reduced or eliminated entirely. He knew this from day one.

27. The enterprise could not find a suitable financial provider for twenty months. Finally, on or about November 1, 2022, the company began transitioning its financial back-office functions, to an outside provider, Future Care Consultants ("FCC"), in a two-part transition: the accounts receivables were transitioned on November 1, 2022, and on January 1, 2023, the accounts payable, payroll, and cash management were transitioned. This transition shrunk Arnaudy's department at AHS by 90% and took away his domination of financial affairs.

28. The enterprise began 2022 reporting approximately $14 million in available cash. On November 29, 2022, Frankl was told by O'Halloran—for the first time—that the enterprise was "effectively . . . running outta money" and had less than six months of cash remaining. Neither Arnaudy nor O'Halloran had reported any such crisis in the intervening months. To fix the loss of trust and transparency, AHS appointed two board members who would report to ACG and its ownership and have three votes each, outnumbering the current board (including Arnaudy), which only had two votes.

29. Arnaudy's roles at AHS and ACG obligated him to disclose the enterprise's ERC receipts, including their amounts, timing, and availability, and the enterprise's true cash position, Arnaudy knew that he had an obligation to disclose those material facts to its owners and the Board who were ignorant of the ERC receipts and the materially better cash position. Those facts were resources within Arnaudy's special knowledge that he did not disclose to other ACG members or its manager.

30. Relying on the representation that the company was "out of money," ownership reluctantly agreed to stop paying rent to landlords beginning December 1, 2022. In what will prove to be the opening for Arnaudy to destroy the enterprise, this included the landlord over the Killeen Facilities.

31. What ownership did not know was that, beginning in early December 2022, the enterprise began receiving millions of dollars in employee-retention tax credits ("ERC"). Arnaudy did not disclose the amounts or timing of those ERC receipts to ownership or the Board, despite being obligated to do so in his roles at AHS and ACG. Had the ERC receipts and true cash position been disclosed, ACG and its ownership would have acted differently: they would have cured or avoided the rent defaults and would not have stopped paying rent, thereby denying the Finch

Landlords the rent-default leverage they later used to install the receivership. Rather than disclose the ERC funds or use them to cure the rent defaults, Arnaudy and O'Halloran used the undisclosed funds to pay themselves. From the outset of the 2021 ownership, they had been instructed in writing that no contracts, raises, bonuses, administrative hires, or capital expenses should be undertaken without ownership's review and approval. Nevertheless, Arnaudy and the CEO awarded themselves substantial unauthorized bonuses and "retro pay." Without the undisclosed ERC funds, Arnaudy could not make those payments to himself. In a plain attempt to either extract money for himself or stop AHS from taking the prudent business decision to outsource many financial functions, on or about December 27, 2022, Arnaudy submitted a "Notice of Termination" for "Good Reason." Arnaudy claimed that the FCC transition diminished his duties, to trigger a year of severance from a company he simultaneously claimed had no money. He then worked to thwart the FCC transition, which failed in early April 2023.

32. In the background, there was another thorn in Arnaudy's side—Fredricksburg Acquisition. Two of AHS's ultimate owners purchased the real estate associated with one of AHS's nursing homes using an entity called Fredricksburg Acquisition, LLC. This was accomplished first by AHS lending Fredericksburg Acquisition $1.75 million needed to complete the purchase. Then, in March 2023, Fredericksburg Acquisition sold the property to AHS for the same price Fredericksburg Acquisition purchased it for (including forgiveness of the note). Arnaudy attended the AHS board meeting approving this transaction; and he supported the motion; but he "wanted [his] potential conflict" as a shareholder of ACG noted. This transaction irked Arnaudy. He felt it amounted to a distribution to shareholders of, but he received nothing. So, on April 13, 2023, Arnaudy emailed AHS's then-CEO Tina Hecht demanding a distribution of $85,051 paid to him.

33. At the same time, in March and early April 2023, Arnaudy and O'Halloran took a new aggressive approach to take over control of AHS, by reducing the number of votes for the two ownership-appointed board seats. Arnaudy and O'Halloran claimed that the ownership-appointed board members had only two votes, not six. Of course, if the Board had only two votes, they would tie Arnaudy and the other management-appointed seat and would be able to stop ACG (as AHS's ownership) from taking control of its subsidiary. Arnaudy did this despite his position as an indirect owner (through Balboa) of ACG and with the intent to thwart Frankl's authority as the ultimate manager of ACG.

34. This coup did not work. Arnaudy and O'Halloran leaned on AHS's attorney, Liz Boydston, to mount the attack. But Boydston was a litigator, not a transactional attorney. So, she asked a "corporate guru" at her firm help. Of course, on April 11, 2023, that corporate guru confirmed that, not only was Frankl correct that "each of Ephraim Diamond and Barry Dershowitz shall have three votes on matters submitted to the Board and Anthony Arnaudy shall have one," but also Monica Blacker did not have a role on the Board:

> Note, unless additional documentation has been prepared to amend the LLCA, the Board is only comprised of 3 members (i.e., Anthony, Ephraim and Barry).

And so, the coup failed. Three days later, and when he was not given a distribution, Arnaudy submitted his resignation as AHS's CFO to Tina Hecht. By April 30, 2023, Arnaudy was out of AHS.

***C. Arnaudy's confidential knowledge of the company's financial architecture.***

35. As the enterprise's CFO, Arnaudy had intimate knowledge of its entire banking architecture, including its account structure, its zero-balance-account (ZBA) sweep mechanisms, and the precise timing of its payroll disbursements and revenue collections. Payroll was disbursed

from treasury accounts on the eighth of each month, with employees paid on the tenth; revenues were collected and swept into treasury accounts each Wednesday.

36. Arnaudy acquired this information solely by virtue of being AHS's and ACG's CFO and was obligated to keep it confidential.

37. This information derived independent economic value from not being generally known to the company's creditors, landlords, or competitors, and the company took reasonable measures to keep it secret. In the hands of the wrong people—especially malicious actors—knowledge of the enterprise's financial information could inflict serious harm. And it did.

***D. Arnaudy sells the confidential information to install a receiver.***

38. The Killeen Facilities had stopped paying rent to the landlords—a group of landlords controlled and managed by Ron Finch (the "Finch Landlords")—in December 2022. Over the summer of 2023, an entity owned by some of ACG's ultimate owners—MR Acquisition—negotiated a purchase of the real estate owned by the Finch Landlords. Critically, this purchase would greatly reduce the Killeen Entities' rent payments during due diligence and eventually forgive all past-due rent obligations. But when negotiations over the sale of that real estate stalled, Finch turned to AHS's former executives for leverage. Arnaudy gave it to him.

39. Arnaudy walked Finch and a court-appointed receiver through every detail of the company's confidential financial information—its account structure, its ZBA sweep mechanisms, and the precise timing of its payroll and revenue flows—for the express purpose of harming the Abri enterprise.

40. The receiver later testified that Arnaudy's assistance was so important that, without it, he would not have taken the case. And when it came to determining which entity owned the roughly $6.9 million sitting in the enterprise's HUD concentration account ending in 7640, the

receiver relied solely on Arnaudy's word, "'cause he [Arnaudy] set up the accounts as CFO back in the day."

41. For this work against the company he had been sworn to protect, Arnaudy was paid $20,000 per month by the Finch Landlords.

***E. The receivership traps $7.4 million based on Arnaudy's false statements.***

42. Armed with Arnaudy's confidential information, the Finch Landlords sued the Killeen Entities and, on the morning of January 9, 2024, applied ex parte for the appointment of a receiver. The supporting declaration recited the intimate details Arnaudy had supplied including that "it is necessary to act subsequent to the monthly payroll, and before the weekly transfer of revenues, in order to capture sufficient cash to maintain operations." That precise timing-of-payment information could only have come from someone with inside knowledge of the company's financial operations.

43. Because the timing was engineered to strike before the weekly Wednesday revenue sweep, the court entered an order appointing a receiver the same day, within hours of the application and without notice to AHS or ACG.

44. Days earlier, the company had discovered approximately $7.4 million in cash that a banking error had obscured, giving it far more than enough to meet its obligations. But by the morning of January 10, 2024, the company learned it could no longer access that money. The funds remained trapped in the HUD concentration account ending in 7640, which had been mislabeled "PM Management." Because the Killeen Entities' names also begin with "PM Management," the receiver asserted control over the account—based solely on Arnaudy's false representation that the account belonged to the operating companies.

45. Arnaudy knew this was false. As the enterprise's former CFO, he knew that the 7640 account was the central concentration account for all of the enterprise's HUD-related facilities—the very position the company had taken months earlier, while Arnaudy was still its CFO, in resisting an earlier receiver's attempt to control the same account. And in June 2024, he would tell AHS's insurer that the receiver's control over that account "could not have been worse" for AHS and that the account "held almost all moneys available to AHS and [the Killeen Facilities]." Arnaudy's misrepresentation deprived the company of access to roughly $7.4 million of its own cash, of which it was then forced to immediately wrest away more than $500,000 in order to make payroll.

***F. Arnaudy is secretly rehired and turned against ownership.***

46. On or about February 1, 2024—the day after his consulting arrangement with Finch expired—Arnaudy was secretly rehired, behind the backs of the Board and ownership. His rehiring was never disclosed to the Board, to ownership, or to the bankruptcy court, and the Board would never have approved it: just weeks earlier, Arnaudy had conspired with Finch and used the company's confidential information to install the receiver that had reduced the enterprise to a shell.

47. Arnaudy's new role had nothing to do with finance. A review of his emails shows that his sole purpose was to find damaging information about ACG's ultimate manager, Frankl. Arnaudy obsessively tried to manufacture a link between a company vendor and Frankl, ignoring the innocent, documented explanation for the payments at issue, because he was "looking for a direct link" he could use against Frankl. And he used AHS personnel to access information to support his specious claims. Upon information and belief, Arnaudy had to use other AHS personnel because he was not granted access to the portions of AHS's systems with the needed information.

48. During his unauthorized tenure from February 1, 2024 through at least June 30, 2024, Arnaudy was paid $40,000 per month from company funds, used company travel accounts and corporate cards, and directed efforts internally, including compiling materials adverse to ownership.

***G. Arnaudy converts the company's funds on his way out.***

49. Throughout the receivership and resulting bankruptcy over the Killeen Entities, O'Halloran was appointed Chief Restructuring Officer of AHS. By May 2024, the bankruptcy plan was confirmed. So, on May 20, 2024, the AHS Board appointed a new CEO who would effectively take over all of O'Halloran's roles as CRO. On May 22, 2024, AHS's new CEO met with O'Halloran and introduced himself as O'Halloran's new superior. This meeting was around noon. By 3:17 P.M. Central Time that day, O'Halloran made sure to pay himself and Arnaudy one last time. Before O'Halloran's access could be revoked, the company's payroll system was accessed to transfer approximately $100,000 to O'Halloran and $40,000 to Arnaudy—money neither was owed nor had authority to take. On information and belief, Arnaudy knew that O'Halloran had been replaced, Arnaudy's unauthorized employment would soon end, and that O'Halloran no longer had consent to make any cash transfers from AHS.

50. In total, during and as a result of the unauthorized scheme, Arnaudy received at least $220,000 from the company and its adversaries, including the $20,000-per-month payments from the Finch Landlords, the $40,000-per-month payments during his secret rehiring, and the unauthorized May 22, 2024 transfer.

***H. Arnaudy holds his interest through Balboa and acts for it.***

51. Arnaudy organized Balboa on February 23, 2021—days before the March 1, 2021 acquisition—and is its sole member, sole manager, and agent for service of process. Balboa's only

designated office is Arnaudy's residence, its only interest is the membership it holds in ACG, and it can act, hold information, and perform or breach its contractual obligations only through Arnaudy. On information and belief, Balboa's sole asset and purpose is to hold Arnaudy's investment in ACG.

52. As a member of ACG, Balboa is bound by Section 12.3 of the ACG Operating Agreement to keep the enterprise's non-public information strictly confidential, an obligation that survives any termination of its membership and that could be performed or breached only through Arnaudy, the sole person through whom Balboa acts and the person who possessed the confidential information. Balboa allowed its sole member and manager to act directly adverse to the AHS enterprise, destroying ACG's revenue sources and directly owned assets (the OpCos).

### ***I. Arnaudy acted in his individual capacity, and the misconduct has left ACG without assets.***

53. Arnaudy resigned as the enterprise's Chief Financial Officer effective April 30, 2023. The core misconduct alleged herein—his disclosure of the company's confidential financial information, his work to install the receivership over ACG's operating companies, and the $20,000-per-month he collected for that work—occurred after that resignation. Arnaudy's acts were done on behalf of the Finch Landlords, in a manner directly adverse to ACG and the enterprise.

54. Arnaudy's February 1, 2024 re-engagement was never authorized by ACG's manager or by AHS's Board, was concealed from both, and was void. It conferred no legitimate office, position, or authority, and Arnaudy used it solely to compile materials adverse to ownership. His diversion of company funds to himself, including the unauthorized May 22, 2024 transfer, was undertaken for his own personal benefit.

55. Each of the wrongful acts alleged herein was undertaken by Arnaudy in his individual capacity, and for his own benefit or the benefit of ACG's adversaries, and not by reason of, or in his capacity as, an officer, manager, member, or affiliate of a member of ACG. No proceeding herein arises from any act or omission performed within Arnaudy's or Balboa's scope of authority for ACG.

56. As a direct result of Defendants' conduct, ACG has been stripped of its operating companies, its enterprise value, and its cash, and is left without assets or operating income.

57. Arnaudy concealed his misconduct, which was inherently unknowable and not reasonably discoverable while it was occurring. ACG first discovered the conduct alleged herein months after its occurrence, following a forensic review of the company's files. This action is timely.

58. As a direct and proximate result of Defendants' conduct, ACG lost the Killeen Entities and other operating companies it owned, lost the value of its enterprise as a going concern, was deprived of access to approximately $7.4 million in cash, incurred substantial fees and costs responding to the receivership and its aftermath, and suffered other damages to be proven at trial.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty — Delaware Law
### (Against Arnaudy)

59. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

60. As an officer (Chief Financial Officer) of ACG and of AHS, and as a member of AHS's board of managers, Arnaudy owed ACG and the AHS enterprise fiduciary duties of loyalty, care, candor, and confidentiality, the scope of which is governed by Delaware law.

61. Arnaudy breached those duties by, among other things: (a) concealing from ownership and the Board the amounts and timing of the enterprise's ERC receipts and its true cash position; (b) awarding himself unauthorized bonuses and "retro pay" in violation of express ownership instructions; (c) disclosing the company's confidential financial and banking information to Finch and the receiver in exchange for payment, to install a receivership over ACG's operating companies and trap the company's cash; (d) falsely representing that the HUD 7640 account belonged to the Killeen Entities; (e) accepting a secret, undisclosed re-engagement and using it to compile materials adverse to ownership rather than to serve the company; and (f) taking unauthorized compensation and reimbursements and conspiring in the unauthorized May 22, 2024 transfer.

62. Arnaudy acted in bad faith, disloyally, and to advance his own interests and those of the company's adversaries, in violation of his duty of loyalty and in a manner constituting a bad faith violation of the implied contractual covenant of good faith and fair dealing and actual fraud under Delaware law.

63. As a direct and proximate result of Arnaudy's breaches, ACG suffered damages in an amount to be proven at trial, including the loss of the Killeen Entities and other operating companies, the loss of its enterprise as a going concern, the unauthorized compensation paid to Arnaudy, and the fees and costs incurred in consequence of his misconduct. ACG is further entitled to disgorgement of all amounts Arnaudy wrongfully received.

**SECOND CAUSE OF ACTION**
**Forfeiture Under the Faithless Servant Doctrine — New York Law**
**(Against Arnaudy)**

64. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

65. Arnaudy was an agent and employee of the company who owed a duty of loyalty and good-faith service.

66. Arnaudy was faithless in the performance of his services. He acted directly against the company's interests—selling its confidential information to its adversaries, working to install a receivership over ACG's operating companies, and using a secret re-engagement to attack ownership—throughout the periods for which he was compensated.

67. Under the faithless servant doctrine, an agent who is faithless in the performance of his duties forfeits all compensation earned during the period of disloyalty, regardless of whether the principal suffered provable damages and regardless of whether the tainted services also conferred some benefit.

68. Arnaudy is therefore required to forfeit and disgorge all compensation and other remuneration he received during his periods of disloyalty, in an amount to be proven at trial and estimated to be no less than $220,000.

## THIRD CAUSE OF ACTION
**Misappropriation of Trade Secrets—Defend Trade Secrets Act, 18 U.S.C. § 1836**
**(Against Arnaudy and Balboa)**

69. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

70. The enterprise's banking architecture—including its account structure, ZBA sweep mechanisms, and the precise, non-public timing of its payroll disbursements and revenue collections—constitutes trade secrets related to services provided in, and affecting, interstate commerce.

71. This information derived independent economic value from not being generally known to, and not being readily ascertainable by, creditors, landlords, competitors, or other persons who could obtain economic value from its disclosure or use, and the company took

reasonable measures to keep it secret, including through confidentiality covenants and restricted internal access.

72. Defendants misappropriated these trade secrets by disclosing and using them without authorization, knowing that Arnaudy had acquired them under circumstances giving rise to a duty to maintain their secrecy and to limit their use.

73. The ACG Operating Agreement is a valid and binding contract between ACG and Balboa. Section 12.3 requires "all non-public information regarding the Company and/or its Members or Manager" be "treated with strict confidentiality by the Company, Members and Manager and not disclosed by any of them to any third parties . . . without the prior written consent of the Manager," and provides that "the confidentiality obligations of the Members and Manager . . . shall survive any termination of their respective memberships in and service with the Company."

74. Balboa's confidentiality obligation under Section 12.3 bound it continuously, including after Arnaudy ceased serving as an officer of ACG and AHS, and remains in force.

75. Arnaudy is Balboa's sole member, sole manager, and agent. Therefore, Arnaudy's knowledge and conduct are imputed to Balboa. Balboa can hold and protect confidential information, and perform its confidentiality obligation, only through him.

76. The misappropriation was willful and malicious. As a direct and proximate result, ACG suffered damages, and Arnaudy was unjustly enriched. ACG is entitled to its actual damages, damages for unjust enrichment, exemplary damages, and its reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3).

**FOURTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets & Confidential Information—New York Common Law**
**(Against Arnaudy and Balboa)**

77. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

78. The enterprise possessed trade secrets and confidential information as described above.

79. Defendants acquired that information through a confidential and fiduciary relationship, and used and disclosed it in breach of an express and implied duty not to do so, and by improper means.

80. As a direct and proximate result, ACG suffered damages in an amount to be proven at trial, and Defendants should be required to disgorge any benefits obtained.

81. Arnaudy's conduct was willful and malicious, warranting exemplary damages.

**FIFTH CAUSE OF ACTION**
**Breach of Contract — ACG Operating Agreement § 12.3 (Confidentiality)**
**(Against Balboa)**

82. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

83. The ACG Operating Agreement is a valid and binding contract to which Balboa, as a member, is a party. Section 12.3 requires that "all non-public information regarding the Company and/or its Members or Manager" be "treated with strict confidentiality by the Company, Members and Manager and not disclosed by any of them to any third parties . . . without the prior written consent of the Manager," and provides that "the confidentiality obligations of the Members and Manager . . . shall survive any termination of their respective memberships in and service with the Company."

84. The disclosed information concerned the finances and banking architecture of ACG and of the enterprise ACG manages and owns and thus constituted non-public information regarding the Company and its Manager within the meaning of Section 12.3.

85. Balboa's confidentiality obligation under Section 12.3 bound it continuously, including after Arnaudy ceased serving as an officer of ACG and AHS, and remains in force.

86. Arnaudy is Balboa's sole member, sole manager, and agent. Balboa can hold and protect confidential information, and perform its confidentiality obligation, only through him. When Arnaudy disclosed the protected information to Finch and the receiver without the Manager's prior written consent, and not in the ordinary course of or to further ACG's business, Balboa, the member bound to maintain that information's confidentiality, breached Section 12.3. Balboa's breach was not made in its capacity as a member of ACG because it was directly contrary to ACG's interests.

87. Balboa's knowledge of the confidentiality obligation is imputed to Arnaudy as its sole manager and member. And Arnaudy's knowledge (including that financial information is confidential) and conduct are imputed to Balboa because Arnaudy is its sole manager and member.

88. ACG performed its obligations under the Operating Agreement.

89. Balboa's breach was committed in bad faith.

90. As a direct and proximate result, ACG suffered damages in an amount to be proven at trial.

91. ACG is entitled to its reasonable attorneys' fees as the prevailing party under Section 12.8 of the Operating Agreement.

**SIXTH CAUSE OF ACTION**
**Conversion**
**(Against Arnaudy)**

92. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

93. ACG, directly and through the enterprise it manages and owns, had legal ownership of, and an immediate superior right to possession of, specific and identifiable funds, including the funds transferred without authorization from company accounts to or for the benefit of Arnaudy.

94. Arnaudy intentionally and without authorization exercised dominion and control over those funds in defiance of ACG's rights, including the unauthorized compensation and the May 22, 2024 transfer. Because the taking was wrongful from its inception, no demand was required; to the extent any demand was required, it is deemed made and refused.

95. As a direct and proximate result, ACG suffered damages in an amount to be proven at trial, but no less than $200,000.

**SEVENTH CAUSE OF ACTION**
**Unjust Enrichment / Money Had and Received**
**(Against Arnaudy)**

96. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

97. Arnaudy received money belonging to ACG and the enterprise it owns, including unauthorized compensation and the funds wrongfully transferred, to which he was not entitled.

98. Arnaudy was enriched at ACG's expense, and it would be against equity and good conscience to permit him to retain that money.

99. ACG is entitled to restitution and disgorgement of all such amounts, in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**Constructive Trust**
**(Against Arnaudy and Balboa)**

100. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

101. Defendants obtained funds and other property through breaches of fiduciary and confidential duties and other wrongful conduct alleged herein, in circumstances in which they should not in equity and good conscience be permitted to retain them.

102. A confidential and fiduciary relationship existed, Defendants were unjustly enriched, and ACG lacks an adequate remedy at law to the extent the funds, property, and their traceable proceeds can be identified.

103. ACG is entitled to the imposition of a constructive trust over all funds, compensation, and property wrongfully obtained or transferred by Defendants, and over their traceable proceeds, including Balboa's membership interest in ACG and any distributions thereon.

**NINTH CAUSE OF ACTION**
**Violation of the Computer Fraud and Abuse Act – 18 U.S.C. § 1030**
**(Against Arnaudy)**

104. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

105. AHS's computer systems—including its email servers, its accounting system, its payroll system, its electronic health-records system, its online banking portals, and its networked file storage are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B), because they are used in and affect interstate commerce and communication.

106. Arnaudy's authorization to access AHS's protected computers, and the information stored on them, terminated when he resigned as Chief Financial Officer effective April 30, 2023.

His purported February 1, 2024 re-engagement was void. It was never authorized by ACG's manager or by AHS's Board. It was concealed from both. Thus, it conferred no authority to access AHS's protected computers or the information stored on them. At all times relevant, Arnaudy was not authorized to access those protected computers or to obtain the information described below.

107. Arnaudy intentionally accessed AHS's protected computers without authorization, and in any event exceeded any access he was authorized to have and thereby obtained information he was not entitled to obtain. Among other things, Arnaudy sent emails to AHS employees requesting that they retrieve and transmit to him company information stored on AHS's protected computers—information he had no authorization to access. Those employees, unaware that Arnaudy's re-engagement and access were unauthorized, retrieved that information from the protected computers and furnished it to him at his direction and for his benefit. Through this conduct Arnaudy obtained information from protected computers that he was not entitled to obtain. Thus, Arnaudy either directly or conspired to commit, and attempted to commit, violations of § 1030 by procuring and directing AHS personnel to access the protected computers and obtain information for his unauthorized use.

108. Arnaudy acted knowingly and with intent to defraud. He used the unauthorized access and information to further his scheme to injure ACG and the enterprise—including to compile materials adverse to ownership and to obtain money and property to which he was not entitled—and by means of that conduct obtained things of value, including the confidential information itself and the approximately $40,000 transferred to him through the company's payroll system on May 22, 2024.

109. As a direct result of Arnaudy's conduct, ACG and the enterprise suffered losses, including the costs of responding to the offense, conducting a forensic examination of the affected

systems, and assessing, restoring, and securing data and access. That loss aggregated more than $5,000 in value during a one-year period.

110. ACG is entitled to maintain this civil action under 18 U.S.C. § 1030(g) and to recover compensatory damages in an amount to be proven at trial, together with injunctive and other equitable relief.

## TENTH CAUSE OF ACTION
**Common-Law Fraud — Delaware Law**
**(Against Arnaudy)**

111. ACG repeats and realleges each of the foregoing allegations as if fully set forth herein.

112. Under Delaware law, common-law fraud requires: (1) a false representation, usually of fact—which under Delaware law includes deliberate concealment of material facts or silence in the face of a duty to speak; (2) the defendant's knowledge or belief that the representation was false, or reckless indifference to its truth; (3) intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction in justifiable reliance; and (5) resulting damage.

113. As ACG's CFO and sole manager of one of its members, Arnaudy held a special relationship with ACG. As a result of that relationship, Arnaudy owed a duty to disclose the ERC receipts and the enterprise's true cash position to ownership and the Board.

114. Arnaudy concealed material facts from ACG. A fiduciary who comes into possession of facts that the entity is obligated to disclose to its members, and who knowingly and in bad faith causes the entity to continue withholding those facts, is liable for fraud.

115. Likewise, once a prior representation becomes materially misleading, silence places the fiduciary in the same position as if the fiduciary knowingly made a false representation. The "out of money" picture that Arnaudy allowed to remain uncorrected became materially misleading when the enterprise began receiving the withheld ERC receipts in December 2022.

116. In December 2022, the OpCos received approximately $5.2 million in ERC receipts. As CFO of AHS and ACG, Arnaudy knew of these receipts.

117. Arnaudy knowingly and in bad faith caused the enterprise to keep those receipts and its true cash position concealed, intended that ACG and its ownership continue to act on that misleading picture, including by stopping rent payments, and did so to preserve his ability to pay himself unauthorized bonuses and "retro pay."

118. ACG and its ownership justifiably relied on the uncorrected "out of money" picture that Arnaudy's silence left in place. In that reliance, they agreed to stop paying rent beginning December 1, 2022. Had Arnaudy disclosed the ERC receipts and the enterprise's true cash position, ACG and its ownership would have acted differently by curing or avoiding the rent defaults and continuing to pay rent, thereby denying the Finch Landlords the rent-default leverage they later used to install the receivership.

119. As a direct and proximate result of the fraud, ACG suffered damages caused by the concealment itself, distinct from the approximately $7.4 million trapped by the receivership. Those damages include the rent defaults and arrears that ACG could have cured or avoided had the ERC receipts and true cash position been disclosed, and the amounts Arnaudy diverted to himself in unauthorized bonuses and "retro pay" paid out of the undisclosed ERC funds. ACG is entitled to recover those damages, together with disgorgement of the amounts Arnaudy diverted.

**DISCOVERY RULE, FRAUDULENT CONCEALMENT, AND EQUITABLE TOLLING**

120. Defendants fraudulently concealed their wrongful conduct, which was inherently unknowable and not reasonably discoverable by ACG while it was occurring. ACG did not discover, and could not with reasonable diligence have discovered, the conduct alleged herein until months after the wrongful acts. ACG affirmatively pleads the discovery rule, fraudulent concealment, and all other applicable tolling doctrines.

**CONDITIONS PRECEDENT**

121. All conditions precedent to ACG's claims have been performed, satisfied, waived, or have otherwise occurred.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Abri Care Group LLC respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, as set forth herein, awarding:

(a) Actual, compensatory, and consequential damages in an amount to be proven at trial;

(b) Forfeiture and disgorgement of all compensation and remuneration paid to Arnaudy during his periods of disloyalty, and of all amounts Defendants wrongfully received;

(c) Restitution and damages for unjust enrichment;

(d) Imposition of a constructive trust over all funds, compensation, and property wrongfully obtained or transferred by Defendants and their traceable proceeds, including Balboa's membership interest in ACG and any distributions thereon;

(e) Exemplary and punitive damages as permitted by law, including under 18 U.S.C. § 1836(b)(3);

(f) Reasonable attorneys' fees and costs, including under Section 12.8 of the ACG Operating Agreement and 18 U.S.C. § 1836(b)(3);

(g) Pre-judgment and post-judgment interest as permitted by law; and

(h) Such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 25, 2026

Respectfully submitted,

STERN LAW GROUP

By: Eric R. Stern, Esq.
*Attorneys for Plaintiff*
3 Columbus Circle, 15th Floor
New York, New York 10019
Tel.: (212) 627-9930 | Cell: (917) 741-3025
EStern@SternLawGroup.com

*Attorneys for Plaintiff Abri Care Group LLC*